AO 91 (Rev. 11/11) Criminal Complaint

AUSA Timothy J. Storino (312) 353-5347

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

FEB 23 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

CARLOS LOPEZ and
CLEMENTE LOPEZ, aka "Junior"

CASE NUMBER:
**UNDER SEAL**

16 CR 111

### CRIMINAL COMPLAINT

MAGISTRATE JUDGE GILBERT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on or about February 3, 2015, and continuing until on or about October 6, 2015, at Joliet, in the Northern District of Illinois, Eastern Division, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 922(a)(1)(A) and 2 | Not being federal licensed firearm dealers, willfully engaging in the business of dealing in firearms. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____
JOSEPH DYNES, Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives (ATF)

Sworn to before me and signed in my presence.

Date: February 23, 2016

_____
*Judge's signature*

City and state: Chicago, Illinois

JEFFREY T. GILBERT, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS | ss

## **AFFIDAVIT**

I, JOSEPH DYNES, being duly sworn, state as follows:

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, and have been so employed since October 2014. My current responsibilities include the investigation of firearms trafficking, illegal firearms possession, and narcotics trafficking.

2.     This affidavit is submitted in support of a criminal complaint alleging that Carlos LOPEZ and Clemente LOPEZ have violated Title 18, United States Code, Section 922(a)(1)(A). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging Carlos LOPEZ and Clemente LOPEZ with unlawful dealing in the business of firearms, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, experience and training, information provided to me by other law enforcement agents and the experience and training of those agents, numerous interviews of a confidential source, review of consensual recordings, and physical surveillance.

4.     At various points in this Affidavit, I will offer my interpretation of certain recorded conversations and meetings in brackets or immediately following a quotation. My interpretation of these conversations is based on my knowledge of the investigation to date, the content and context of the conversations as well as prior and subsequent conversations, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations. The summaries of conversations included in this Affidavit do not include all statements or topics covered during the course of the recorded conversations. In addition, the conversations are based on draft, not final, transcripts of the conversations. Times, where provided, are approximate.

5.     Based on the information contained in this Affidavit, I submit that there is probable cause to believe that, from on or about February 3, 2015, and continuing until on or about October 6, 2015, CARLOS LOPEZ and CLEMENTE LOPEZ, not being federal licensed firearms dealers, did willfully engage in the business of dealing in firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A) and 2.

## FACTS IN SUPPORT OF PROBABLE CAUSE

*Introduction and Background*

6.     Since July 2014, ATF has been investigating a faction of the Latin Kings street gang based in Joliet, Illinois (the "Joliet Latin Kings"). In the course of that investigation, law enforcement has employed a variety of law enforcement tactics and tools, including the use of a confidential source (hereinafter "CS"), the consensual recording of telephone calls with Joliet Latin Kings gang members, the consensual recording of in-person meetings of the Joliet Latin Kings, and the purchase of illegal narcotics and firearms by the CS from various Joliet Latin Kings gang members.

7.     As noted above, this investigation has employed the use of a CS. The CS is a member of the Joliet Latin Kings who has been cooperating with the ATF in relation to this investigation since in or around April 2014, after agents approached the CS and advised the CS that they suspected that he/she was engaged in narcotics trafficking. The CS agreed to cooperate with federal law enforcement. The CS is cooperating in hopes that he/she will not be charged for these offenses, and, beginning in or around April 2014, the CS has been paid for his/her cooperation in the instant investigation. To date, the CS has been paid approximately $21,000 for his/her cooperation in relation to the instant gang investigation. The CS has also been paid for his/her cooperation in two other investigations in the amount of approximately $1,000. The CS has arrests for weapons offenses, traffic offenses, public peace/disorderly conduct, criminal damage to property, and dangerous drugs,

as well as convictions for narcotics possession and unlawful possession of a weapon. Neither the ATF nor the United States Attorney's Office has made any promises to the CS in exchange for his/her cooperation.

8.　The information contained herein that was obtained from the CS has been corroborated and crosschecked, where possible, by investigation and law enforcement computer systems and documents. This affiant and other law enforcement officers have taken part in the interview process and analysis of the information provided by the CS and have found the CS's information to be truthful and reliable. In addition, the CS has been corroborated extensively by controlled undercover activities with other gang members through the use of electronic surveillance techniques, including both video and audio recordings of the undercover meetings and contraband transactions.

9.　As detailed below, over the course of this investigation, CARLOS LOPEZ and CLEMENTE LOPEZ sold a total of 10 firearms to the CS over the course of four separate audio-video recorded meetings, specifically: (1) CLEMENTE LOPEZ sold one firearm to the CS on February 3, 2015; (2) CLEMENTE LOPEZ and CARLOS LOPEZ sold two firearms to the CS on February 5, 2015; (3) CLEMENTE LOPEZ and CARLOS LOPEZ sold two firearms to the CS on August 3, 2015, followed by an additional sale of third firearm by CARLOS LOPEZ later that same day; and (4) CARLOS LOPEZ sold five firearms to the CS on October 6, 2015.

*February 3, 2015, purchase of a firearm from CLEMENTE LOPEZ*

10.    In or around late January 2015, the CS was in discussions with Individual A, who the investigation has revealed is a ranking member of the Joliet Latin Kings, regarding the purchase of a firearm. The transaction never occurred between the CS and Individual A, and instead, Individual A provided the CS with the telephone number of Individual A's source, specifically a telephone number ending in 0855. On or about February 2, 2015, at approximately 11:27 a.m., the CS was contacted by a person he/she knew as "Junior," later identified as CLEMENTE LOPEZ, at a telephone number ending in 0855.[1] During the recorded call, CLEMENTE LOPEZ asked the CS if "you still want that," referring to the firearm the CS and Individual A previously discussed, and the CS responded affirmatively. CLEMENTE LOPEZ stated he had two more, specifically, "a 40 and two 25's." The CS asked CLEMENTE LOPEZ how many he had together, and CLEMENTE LOPEZ responded, "four, man, together." The CS asked CLEMENTE LOPEZ to think of a "good price" for all of the firearms and let the CS know. CLEMENTE LOPEZ agreed, but stated that he wanted to get "rid of this one first [referring to the .38 caliber revolver purchased by the CS later that day]." During another call at

---

[1] The identification of CLEMENTE LOPEZ here is based on the following: (1) law enforcement's surveillance of the person who subsequently met with the CS on or about February 3, 2015, matched the appearance of known photographs of CLEMENTE LOPEZ in the same investigation; (2) on or about February 3, 2015, the CS positively identified CLEMEMNTE LOPEZ as the subject known to him as "Junior" from a known photograph of CLEMENTE LOPEZ; and (3) law enforcement subsequent identification of CLEMENTE LOPEZ's voice on a recording as he sold the CS a firearm on or about February 3, 2015, because that voice was recorded during past and future recorded phone calls with the CS and future recorded meetings with the CS. Unless otherwise noted herein, all calls and texts between the CS and CLEMENTE LOPEZ were recorded. Further, all calls and texts with CLEMENTE LOPEZ related to the transactions on February 3, 2015 and February 5, 2015 occurred over the same 0855 telephone number.

approximately 4:13 p.m. that same day, the CS advised CLEMENTE LOPEZ that he/she had to work and could not do the deal that day. They agreed to do the deal the next day, that is, February 3, 2015. The CS asked if CLEMENTE LOPEZ would still have the firearm tomorrow, and CLEMENTE LOPEZ responded that he had the firearm and "three more."

11.     On or about February 3, 2015, over a series of telephone calls and text messages between the CS and CLEMENTE LOPEZ, they agreed to meet at 3:30 p.m. that day at the upstairs apartment of a building located on the 700 block of Collins Street, Joliet, Illinois.

12.     At approximately 3:30 p.m., agents met with the CS at a prearranged meeting location. The agents searched the CS and the CS's vehicle for contraband, with negative results, and gave $350 to the CS in prerecorded United States currency. The agents equipped and activated the CS with audio-video recording equipment. Shortly thereafter, the CS drove away from the staging location under agent surveillance.

13.     At approximately 3:51 p.m., agents observed the CS arrive at a residence near the intersection of Ward Avenue and Collins Street in Joliet, Illinois.

14.     At approximately 3:53 p.m., the CS received a telephone call from CLEMENTE LOPEZ during which the CS informed CLEMENTE LOPEZ he/she was at his door. Agents observed the CS enter the residence.

15.     As reflected on the audio-video recording device and debriefed by the CS, CLEMENTE LOPEZ let the CS in the apartment. Inside the apartment,

CLEMENTE LOPEZ handed the CS a green rag with a revolver and stated, "I clean it," referring to the firearm. CLEMENTE LOPEZ told the CS that his "guy [referring to his supplier]" still has three more firearms. The CS inquired whether the firearm worked and CLEMENTE LOPEZ stated, "Yeah it's workin." The CS then gave CLEMENTE LOPEZ $350 in exchange for the revolver. CLEMENTE LOPEZ told the CS that the gun was "loud." CLEMENTE LOPEZ told the CS he was going to call his firearm supplier and get a price for the other guns he had to sell. The CS then left the apartment.

16.     At approximately 3:57 p.m., agents observed the CS exit the residence and return to his/her vehicle, but the CS's vehicle was locked. At approximately 4:04 p.m., the CS called CLEMENTE LOPEZ, and advised him that he/she was locked out of his/her car. The CS told CLEMENTE LOPEZ that his/her "guy" was coming to pick up the CS because the CS was trying "to get off the street" because the CS "got this thing [firearm]" with him/her. Agents then drove to the CS, picked him/her up, and drove to a predetermined meeting location.

17.     At approximately 4:06 p.m., agents met with the CS at the predetermined meeting location. Agents recovered from the CS a green rag, containing a loaded FIE Corporation, Titan Tiger, .38 caliber revolver, bearing serial number 0073432. Agents searched the CS's person and his/her vehicle for additional contraband, with negative results.

*February 5, 2015, purchase of two firearms from*
*CLEMENTE LOPEZ and CARLOS LOPEZ*

18.     Following the above sale of a .38 caliber revolver to the CS from CLEMENTE LOPEZ, at approximately 5:14 p.m. on February 3, 2015, the CS received a telephone call from CLEMENTE LOPEZ. During that recorded call, CLEMENTE LOPEZ spoke in Spanish, to which the CS responded, "How much is that because I don't know Spanish too well." CLEMENTE LOPEZ told the CS his supplier wanted "550 [$550]" for the "two 25's [firearms]." CLEMENTE LOPEZ further advised that the .40 caliber that his source had was sold to another person. The CS and CLEMENTE LOPEZ agreed to conduct the firearms transaction on February 5, 2015.

19.     On or about February 4, 2015, at approximately 1:56 p.m., the CS sent a text message to CLEMENTE LOPEZ, in which the CS asked, "You cant get me those 25s for tomorrow?" CLEMENTE LOPEZ responded, "Yea what time?" Over a series of additional text messages, they agreed to meet at 7:00 or 7:30 p.m. the next day to conduct the transaction.

20.     At approximately 2:41 p.m., the CS called CLEMENTE LOPEZ, during which CLEMENTE LOPEZ stated, "Yeah, he said yeah, $550 for both of them," referring to his source who had two .25 caliber handguns that he would sell the CS for $550.

21.     On or about February 5, 2015, at approximately 7:15 p.m., agents met with the CS at a predetermined meeting location. Agents searched the CS and the CS's vehicle, with negative results, and gave the CS $550 in prerecorded United States currency. The agents equipped and activated the CS with audio-video

8

recording equipment. Shortly thereafter, the CS drove away from the staging location under agent surveillance.

22.     At approximately 7:45 p.m., agents observed the CS arrive and park near the same residence located in the area of Ward Avenue and Collins Street in Joliet, Illinois, where the February 3, 2015 deal occurred. The CS exited his/her vehicle and went upstairs to the apartment door. As reflected on the audio-video recording device, the CS knocked on the door and, as debriefed by the CS and reflected on the audio-video recording, CLEMENTE LOPEZ[2] opened the door and let the CS inside the apartment. Inside the apartment, CLEMENTE LOPEZ stated, "It's my little brother," referring to the source bringing the firearms.

23.     At approximately 7:47 p.m., as reflected on the audio-video recording, CLEMENTE LOPEZ stated that they, referring to himself and CARLOS LOPEZ, get the firearms from somebody else. CLEMENTE LOPEZ then called an unknown subject on the telephone and stated, "Hey he's waiting." After the call, CLEMENTE LOPEZ told the CS he was on the way. CLEMENTE LOPEZ told the CS that he could get bulletproof vests, which he described as "thick, fucking heavy though." The CS asked how much for a bulletproof vest, and CLEMENTE LOPEZ responded, "$400." CLEMENTE LOPEZ told the CS that his brother was coming from the area by Larkin Street in Joliet, Illinois.

---

[2] The identification of CLEMENTE LOPEZ is based on the following: (1) law enforcement surveillance of the person who met with the CS on or about February 5, 2015, matched the appearance of known photographs of CLEMENTE LOPEZ in the same investigation; and (2) law enforcement's subsequent identification of CLEMENTE LOPEZ's voice on a recording as he sold the CS a firearm on February 5, 2015, because that voice was recorded during past and future telephone calls and meetings with the CS.

24.     At approximately 7:56 p.m., agents observed a grey SUV, Illinois registration S826365,[3] arrive behind the residence near Ward Avenue and Collins Street in Joliet, Illinois. A male Hispanic subject, subsequently identified as CARLOS LOPEZ,[4] exited the vehicle and entered the rear door of the upstairs apartment at the residence on the 700 block of Collins Street.

25.     At approximately 7:56 p.m., as reflected on the audio-video recording device, CLEMENTE LOPEZ told the CS that his guy just arrived. CARLOS LOPEZ entered the apartment and shook hands with the CS, identifying himself as "Carlos." According to the CS, CARLOS LOPEZ then showed the CS two .25 caliber handguns, at which time the CS stated, "Damn, those mother fuckers are nice, clean too." CARLOS LOPEZ stated, "I have one like that one," referring to one of the firearms. As reflected on the audio-video recording device, CLEMENTE LOPEZ stated, "I like this one," as he pretended to shoot the gun. CARLOS LOPEZ asked the CS if he/she heard of a "PMR 30," and then described it as a ".22 with a 30 shot," meaning a .22 caliber firearm with a 30-round magazine. CARLOS LOPEZ stated the .22 caliber firearm with the 30-round magazine was new in the box, and that

---

[3]  A query of a law enforcement database revealed that the vehicle was registered to CARLOS LOPEZ and Individual B at 2006 Dartmoor Drive, Joliet, Illinois 60435.

[4] The identification of CARLOS LOPEZ here is based on the following: (1) law enforcement surveillance of the person who met with the CS on or about February 5, 2015, matched the appearance of known photographs of CARLOS LOPEZ in the same investigation; (2) law enforcement showed the CS a known photograph of CARLOS LOPEZ, and the CS identified the subject who sold him/her two firearms on February 5, 2015, was CARLOS LOPEZ; and (3) law enforcement's subsequent identification of CARLOS LOPEZ's voice on a recording as he sold the CS two firearms on February 5, 2015, because that voice was recorded during future meetings and telephone calls with the CS.

everything he gets comes from an auction in Georgia. According to the CS, the CS then handed CARLOS LOPEZ $550 in exchange for the two firearms, which were handed to the CS. CARLOS LOPEZ stated he already sold one of the .22 calibers, however he had another one. CARLOS LOPEZ asked the CS if he/she ever heard of a "ghost gun," referring to an untraceable firearm. CARLOS LOPEZ explained the "ghost gun" was a ".38 special" and the "cops can't trace it" and "if you kill a motherfucker, they won't trace you." CARLOS LOPEZ stated he wanted $1,500 for the "ghost gun." CARLOS LOPEZ stated, "If you need shells, I can get you."

26. At approximately 8:01 p.m., agents observed the CS exit the residence, reenter the CS's vehicle, and return to a predetermined meeting location. There, agents recovered from the CS (1) a Lorcin, model L25, .25 caliber pistol, bearing serial number 179992; and (2) a Raven Arms, model P25, .25 caliber pistol, bearing serial number 4926683. Agents searched the CS and the CS's car for additional contraband, with negative results.

*August 3, 2015, purchase of two firearms from*
*CLEMENTE LOPEZ and CARLOS LOPEZ*

27. On or about August 2, 2015, the CS advised agents that, within one week preceding August 2, 2015, he/she met with CARLOS LOPEZ and CARLOS LOPEZ informed the CS he had two firearms for sale for $1,100.[5]

28. On or about August 3, 2015, at approximately 9:50 a.m. and 9:51 a.m., the CS received two telephone calls from a telephone number ending in 1374, and the caller did not leave a message. At approximately 10:39 a.m., the CS sent a text message to a telephone number ending in 1374, asking "Who is this?" The person responded, "Junior [CLEMENTE LOPEZ]."[6] At approximately 10:39 a.m., CLEMENTE LOPEZ called the CS. CLEMENTE LOPEZ said "What up [the CS]," and the CS responded, "What up Junior." CLEMENTE LOPEZ referenced his brother (CARLOS LOPEZ), and the CS stated that CARLOS LOPEZ "came by yesterday" and the CS told him that he/she wanted the firearms CARLOS LOPEZ told the CS about. CLEMENTE LOPEZ explained the firearms are "fuckin' bad." The CS stated that CARLOS LOPEZ explained he wanted "11 [$1,100] for them [the firearms]." The CS asked if there was a time to pick up them up, and CLEMENTE LOPEZ repeated that the firearms were "fuckin' bad dude, they're clean and

---

[5] The CS was not equipped with an audio-video recording device at the time of the meeting because it was not a planned meeting.

[6] In addition to CLEMENTE LOPEZ self-identifying, the number was identified as being used by CLEMENTE LOPEZ because (1) the voice of the user matched CLEMENTE LOPEZ's voice, as previously identified, and (2) CLEMENTE LOPEZ in fact met with the CS after the CS communicated with the 1374 telephone number, as detailed below. All calls and texts with CLEMENTE LOPEZ related to the August 3, 2015, transaction occurred over this telephone number.

12

everything." CLEMENTE LOPEZ said that he would call CARLOS LOPEZ and tell him that the CS was interested in the firearms. The CS stated that he/she would buy the firearms today. About five minutes later, CLEMENTE LOPEZ and the CS spoke again, and CLEMENTE LOPEZ said that CARLOS LOPEZ would call the CS right now.

29.     At approximately 10:51 a.m., the CS sent a text message to CARLOS LOPEZ at a telephone number ending in 9529, and stated: "a whats up Carlos this [the CS]... we gonna make that happen today?" CARLOS LOPEZ responded, "Yes."[7] A few minutes later, the CS sent another text message to CARLOS LOPEZ, which read: "Does 4:30 sound good to you... I have to get the money together... You said 1100 right?" CARLOS LOPEZ again responded, "Yes."  The CS sent another text message to CARLOS LOPEZ, requesting a picture of the firearms because the CS "forgot what kind [CARLOS LOPEZ] had..." CARLOS LOPEZ responded, "A 40 and 9." The CS, in another text message, asked CARLOS LOPEZ to hold them, and CARLOS LOPEZ agreed in response, adding, "Ok, they're bad ass."

30.     At approximately 1:36 p.m., the CS sent a text message to CARLOS LOPEZ asking, "You think you can be ready at 3." CARLOS LOPEZ did not respond. About ten minutes later, the CS called CARLOS LOPEZ, which went to voicemail. At approximately 1:53 p.m., the CS sent a text message to CLEMENTE

---

[7] In addition to CARLOS LOPEZ self-identifying, this number was identified as being used by CARLOS LOPEZ because (1) the voice of the user matched CARLOS LOPEZ's voice, as previously identified; and (2) CARLOS LOPEZ in fact met with the CS after the CS communicated with the 9529 telephone number, as detailed below. All calls and texts between the CS and CARLOS LOPEZ were recorded and occurred over this number.

LOPEZ, asking: "whats up bro ... See if your borther [CARLOS LOPEZ] will be ready at 3." A few minutes later, CLEMENTE LOPEZ responded, "ok call me whet [sic] u ready." The CS responded, "OK I will..."

31.     At approximately 2:08 p.m., CLEMENTE LOPEZ and the CS spoke again. CLEMENTE LOPEZ asked if he wanted the firearms "for sure," and the CS responded affirmatively. The CS and CLEMENTE LOPEZ agreed to talk again at 3:00 p.m. and the CS asked where they would do the transaction. CLEMENTE LOPEZ stated that he was not sure because the source wanted him (CLEMENTE LOPEZ) to pay him (the source) first. CLEMENTE LOPEZ stated that this source had "a lot of shit, a lot of shit." CLEMENTE LOPEZ bragged the firearms were "clean." They agreed to speak around 3:00 or 3:30 p.m.

32.     At approximately 3:15 p.m., agents met with the CS at a predetermined meeting location. Agents searched the CS and the CS's vehicle, with negative results, and gave the CS $1,100 in prerecorded United States currency. The agents equipped and activated the CS with audio-video recording equipment. Shortly thereafter, the CS drove away from the staging location under agent surveillance.

33.     At approximately 3:17 p.m., the CS received a call from CARLOS LOPEZ. The CS stated that he/she needed to grab some cash, and then call CLEMENETE LOPEZ and meet up at CLEMENTE LOPEZ's house in the next 30 minutes. The CS asked if CARLOS LOPEZ was available, and he responded that he

(CARLOS LOPEZ) "already got them [the forearms]." They agreed that the CS would meet CARLOS LOPEZ at CLEMENTE LOPEZ's house.

34. At approximately 3:23 p.m., the CS called CLEMENTE LOPEZ, and the CS stated he/she was fifteen minutes away. CLEMENTE LOPEZ told the CS that he moved and now lived on Benton Street in Joliet, Illinois, and that his brother (CARLOS LOPEZ) was already there. The CS asked whether they could do the deal in the driveway of where CLEMENTE LOPEZ previously resided. CLEMENTE LOPEZ agreed. The CS asked if they had the firearms already, and CLEMENTE LOPEZ said he would ask his brother, CARLOS LOPEZ. CLEMENTE LOPEZ then spoke in Spanish with another person, and responded to the CS, "Yea, we got 'em. He [CARLOS LOPEZ] got everything."

35. At approximately 3:26 p.m., agents observed the CS arrive at the residence on the 700 block of Collins Street, Joliet, Illinois from the previous transactions. Approximately three minutes later, agents observed a white van approach the same area where the CS was.

36. At or around 3:30 p.m., the CS received a call from CLEMENTE LOPEZ, and CLEMENTE LOPEZ asked where he/she was. The CS responded in the back of CLEMENTE LOPEZ's old building near a truck with a "boom on it." CLEMENTE LOPEZ stated that they were in a white van, and the CS asked if they wanted him/her to "jump in there" with them. CLEMENTE LOPEZ offered to "jump" into the CS's car, and the CS agreed that that would be better. At approximately 3:30 p.m., agents observed two persons, identified later as

CLEMENTE LOPEZ and CARLOS LOPEZ, exit the white van and get into the CS's vehicle.

37.     As reflected on the audio-video recording and debriefed by the CS, inside the CS's vehicle CLEMENTE LOPEZ sat in the backseat and CARLOS LOPEZ sat in the front passenger seat. According to the CS, CARLOS LOPEZ placed the firearms between the front seats, and as reflected on the audio-video recording, both CARLOS LOPEZ and the CS looked down in between the two front seats. CARLOS LOPEZ identified one of the firearms as a 40 caliber, and the CS stated that he/she may come back for that firearm. CARLOS LOPEZ explained how his uncle brought the firearms from an auction in Georgia. CARLOS LOPEZ stated that the 40 caliber was $700, and that he had a "Taurus" as well in his "crib." According to the CS, the CS handed $1,100 to CARLOS LOPEZ, and CLEMENTE LOPEZ and CARLOS LOPEZ then exited the car. As they exited the car, CARLOS LOPEZ also mentioned that he could get an AK rifle.

38.     At approximately 3:32 p.m., agents observed CLEMENTE LOPEZ and CARLOS LOPEZ exit the CS's car and return to the white van, and drive away. As the van drove away, agents observed the license plate of the white van: an Illinois temporary license plate 838R049.[8] The CS drove away at the same time under surveillance.

39.     Agents subsequently met the CS at a predetermined meeting location. There, agents recovered from the CS (1) a Star, Bonifacio Echeverria, Ultra Star,

_____

[8] A query of a law enforcement database revealed that this vehicle was registered to CARLOS LOPEZ.

9mm caliber pistol, bearing serial number 2173475; and (2) a Jimenez Arms, J.A. Nine, 9mm caliber pistol, bearing serial number 236922. Agents searched the CS and the CS's car for additional contraband, with negative results.

40. At approximately 3:50 p.m., the CS contacted CLEMENTE LOPEZ, and during that recorded telephone call, the CS told CLEMENTE LOPEZ he/she "want to grab that other one [firearm] too," referring to the other firearm CLEMENTE LOPEZ and CARLOS LOPEZ showed him/her during the firearms transaction earlier that same day. CLEMENTE LOPEZ asked, "right now?" CLEMENTE LOPEZ stated he would call his "little" brother, referring to CARLOS LOPEZ, and they would meet at the "same place."

41. At approximately 3:52 p.m., the CS received a telephone call, during which CARLOS LOPEZ asked the CS if he/she wanted the "other one." CARLOS LOPEZ and the CS agreed to meet at the same place they met at earlier that same day.

42. At approximately 3:52 p.m., agents met with the CS at a predetermined meeting location. Agents searched the CS and the CS's vehicle, with negative results, and gave the CS $700 in prerecorded United States currency. The agents equipped and activated the CS with audio-video recording equipment. Shortly thereafter, the CS drove away from the staging location under agent surveillance.

43. At approximately 3:56 p.m., agents observed the same white van observed earlier in the day return to the area of the residence on the 700 block of

Collins Street, Joliet, Illinois. One minute later, agents observed the CS's car arrive in the area of a residence on the 700 block of Collins Street.

44.     According to the CS and as reflected on the audio-video recording, CARLOS LOPEZ entered the front passenger seat of the CS's vehicle. According to the CS, CARLOS LOPEZ placed the firearm and ammunition in between the front two seats. As reflected on the video-audio recording, the CS counted $700, which, according to the CS, he/she handed to CARLOS LOPEZ. CARLOS LOPEZ also stated that he would try to obtain an AK rifle to sell to the CS.

45.     At approximately 4:00 p.m., agents observed the CS depart the area, and agents conducted surveillance of the CS until the CS arrived at a predetermined meeting location. There, agents recovered from the CS a Taurus PT101AF, .40 caliber pistol, bearing serial number SNE78640. Agents searched the CS and the CS's car for additional contraband, with negative results.

*October 6, 2015, purchase of five firearms from CARLOS LOPEZ*

46.     On or about October 4, 2015, at approximately 10:04 p.m., the CS received an incoming call from CARLOS LOPEZ, but the CS did not answer the call. Three minutes later, the CS received another telephone call from CARLOS LOPEZ, and CARLOS LOPEZ stated, "I'm gonna send you a picture of this job [firearm]. Let me know if you want it."

47.     At approximately 10:07 p.m., the CS received a text message from CARLOS LOPEZ, which contained a photograph of five firearms, specifically four semi-automatic pistols and one revolver.

48.     At approximately 10:16 p.m., the CS called CARLOS LOPEZ. During that recorded telephone call, CARLOS LOPEZ asked the CS "did you get it," referring to the photograph. The CS confirmed he/she received the photograph and asked CARLOS LOPEZ, "what you trying to get for that job," meaning how much money CARLOS LOPEZ wanted for the five firearms. CARLOS LOPEZ stated, "I gotta call him cause he was going to work," referring to talking to the source who currently had possession of the five firearms. The CS asked CARLOS LOPEZ to text him/her how much for "the whole job." CARLOS LOPEZ told the CS that the person who had the firearms also "got that one coming for you." The CS asked, "That big one," referring to an assault rifle the CS asked CARLOS LOPEZ for in a previously-recorded firearm transaction. CARLOS LOPEZ stated they were just waiting for them "to bring it."

49.     At approximately 10:20 p.m., the CS received a text message from CARLOS LOPEZ, which stated: "The job is for all $2875," meaning $2,875 for the five firearms.

50.     At approximately 10:25 p.m., the CS contacted CARLOS LOPEZ. During that recorded telephone call, the CS stated, "Yeah you know what, I'm gonna go ahead and uh, just take it, fuck it man, I got the money and shit." The CS asked CARLOS LOPEZ if they could do the deal "tomorrow." CARLOS LOPEZ stated: "Let me know what time cause he wanted to know what time." The CS stated between "1 and 2 o'clock." CARLOS LOPEZ stated, "I'll call him right now and tell him 2 o'clock."

51.     On or about October 6, 2015, at approximately 12:36 p.m., the CS received a telephone call from CARLOS LOPEZ. The CS asked, "We still gonna do that or what?" CARLOS LOPEZ responded affirmatively and stated he wanted to do the deal in Romeoville, Illinois, because that was where he was working. The CS asked if CARLOS LOPEZ had everything with him. CARLOS LOPEZ stated that he "got them with me," referring to having the five firearms in his possession.

52.     At approximately 2:15 p.m., agents met with the CS at a predetermined meeting location. Agents searched the CS's person, with negative results, and provided the CS with an undercover vehicle, which was also searched with negative results. Agents gave the CS $2,875 in prerecorded United States currency, and equipped and activated the CS with an audio-video recording device.

53.     At approximately 2:31 p.m., in the presence of the agents, the CS called CARLOS LOPEZ and asked CARLOS LOPEZ to meet him/her at a bar located in Romeoville, Illinois. CARLOS LOPEZ agreed.

54.     At approximately 2:46 p.m., agents conducted surveillance of the CS as he/she drove to the area of 721 North Independence, Romeoville, Illinois, the location of the bar the CS drove to. At approximately 2:49 p.m., law enforcement observed the CS arrive at the parking lot of the bar.

55.     At approximately 2:55 p.m., the CS received a telephone call from CARLOS LOPEZ, during which CARLOS LOPEZ told the CS to come to McKool street and look for his work van parked at a house that was for sale. CARLOS LOPEZ gave the CS directions. The CS agreed to meet him there.

56.     Agents conducted surveillance as the CS travelled to a business located at 300 North Independence, Romeoville, Illinois. At approximately 3:02 p.m., agents observed the CS park at the parking lot at 300 N. Independence, Romeoville, Illinois. Agents also drove to the area of McKool Street and observed a white panel van parked in the driveway of 221 McKool Street, Romeoville, Illinois. Agents observed a "For Sale" sign in front of the residence, which appeared to be vacant.

57.     At approximately 3:04 p.m., the CS called CARLOS LOPEZ, during which the CS told CARLOS LOPEZ he/she saw "squad [police vehicle] just roll down that main road." The CS asked CARLOS LOPEZ to meet him at a restaurant located at 300 North Independence, Romeoville, Illinois ("Restaurant A"). CARLOS LOPEZ agreed.

58.     Agents conducting surveillance located near the area of 221 McKool Street observed a male subject sitting in the driver's seat of the white panel van, which pulled down the driveway to the rear of the residence.

59.     At approximately 3:15 p.m., the CS sent a text message to CARLOS LOPEZ, which stated, "Were you at foo? I'm in a grey truck... I'm waiting on you..."

60.     At approximately 3:20 p.m., agents observed the white panel van pull out of the driveway of 221 McKool Street and travel towards Restaurant A.

61.     At approximately 3:23 p.m., agents observed a white Chevrolet van pull into the parking lot of Restaurant A, and park behind the CS. Agents observed the CS exit the undercover vehicle and walk to the passenger side of the van. As

reflected on the audio-video recording device, CARLOS LOPEZ[9] stated to the CS, "I didn't bring em dog," meaning CARLOS LOPEZ did not bring the five firearms with him. CARLOS LOPEZ stated he saw the police "pass by" in a "grey Explorer." CARLOS LOPEZ told the CS that he "hide it," meaning he hid the guns at the residence. CARLOS LOPEZ told the CS, "I'll tell you where they're at." The CS asked if CARLOS LOPEZ "stashed 'em pretty good," and CARLOS LOPEZ responded affirmatively.

62.     At approximately 3:25 p.m., as reflected on the audio-video recording device, CARLOS LOPEZ received an incoming telephone call, and stated on the telephone, "let me tell my boy to go now then." CARLOS LOPEZ hung up the telephone and told the CS "guess it was someone else then," meaning the grey Explorer was not the police. The CS then asked CARLOS LOPEZ, "how you want to do this?" CARLOS LOPEZ told the CS to give him the money and follow him to the residence. CARLOS LOPEZ stated, "you're gonna see me put my signal, the house it has for sale sign. Just go all the way to the back and then call me when you're there."

63.     At approximately 3:26 p.m., as reflected on the audio/video recording device, the CS got into CARLOS LOPEZ's vehicle. The CS asked CARLOS LOPEZ if "they all there though," referring to all five firearms being at the residence.

---

[9] The identification of CARLOS LOPEZ here is based on the following: (1) law enforcement surveillance of the person who met with the CS on or about October 6, 2015, matched the appearance of known photographs of CARLOS LOPEZ in the same investigation; and (2) law enforcement subsequent identification of CARLOS LOPEZ's voice on a recording as he sold the CS five firearms on October 6, 2015, because that voice was recorded during past and future meetings with the CS and recorded phone calls with the CS.

CARLOS LOPEZ answered "Yeah, yeah, all the one's in the picture, and they all have two clips," referring to each firearm having two magazines. The CS then counted out $2,875, stating "a lot of fucking money" and "twenty-eight seventy-five." CARLOS LOPEZ told the CS to "pull all the way to the back and then just call me."

64.    At approximately 3:28 p.m., agents observed the CS exit the CAROLOS LOPEZ's van and reenter the undercover vehicle. Agents observed the van, followed by the undercover vehicle, depart the parking lot and travel West on McKool Street.

65.    At approximately 3:31 p.m., the CS received a telephone call from CARLOS LOPEZ, during which CARLOS LOPEZ directed the CS to the rear of 221 McKool Street, Romeoville, Illinois. CARLOS LOPEZ then told the CS that the firearms are in a "garbage can, the one with the yellow lid" in the rear of that residence. CARLOS LOPEZ stated he would stay on the phone with the CS until the CS had the guns.

66.    At approximately 3:31 p.m., agents observed the CS pull into the driveway of 221 McKool Street, Romeoville, Illinois. As captured on the audio-video recording device and debriefed by the CS, the CS exited the undercover vehicle and opened a garbage can with a yellow lid. According to the CS, the CS removed a plastic bag from the garbage can. As captured on the audio-video recording device, the CS returned to the undercover vehicle and looked through a plastic bag. CARLOS LOPEZ told the CS to "open it up, there should be five in there." CARLOS LOPEZ also told the CS that they all have two clips, except for the "circle," referring

to the revolver. Back inside the undercover vehicle, the CS looked through the plastic bag, and confirmed to CARLOS LOPEZ, "I got 'em." CARLOS LOPEZ told the CS that he has more coming in "two weeks." CARLOS LOPEZ told the CS that CARLOS LOPEZ wanted to keep "that little grey one," referring to one of the firearms.

67.     At approximately 3:38 p.m., agents followed the CS to a predetermined meeting, where the agents recovered the following from the CS: (1) a Taurus, PT24/7, .40 caliber pistol, bearing serial number SD096646; (2) a Ruger, P91DAO, .40 caliber pistol, bearing serial number 340-17803; (3) a Colt, 1911, .22 caliber pistol, bearing serial number D57082; (4) a Jimenez, J.A. Nine, 9mm caliber pistol, bearing serial number 135901; and (5) a Smith and Wesson, Magnum, .357 caliber revolver, bearing serial number AAU8713. Agents searched the CS and the undercover vehicle for additional contraband, with negative results.

*Interstate Nexus of Firearm*

68.     An ATF firearms expert has examined the description of all of the aforementioned firearms purchased by the CS from CLEMENTE LOPEZ and CARLOS LOPEZ, and has determined that the firearms were not manufactured in the State of Illinois, and therefore had traveled in interstate commerce prior to either of their possession of them.

*Federally-licensed firearms dealers*

69.     Review of a law enforcement database revealed that neither CLEMENTE LOPEZ nor CARLOS LOPEZ were not at the time of these transactions, and never have been, federally-licensed firearms dealers.

## CONCLUSION

70.     Based on the foregoing, I believe there is probable cause to believe that, from on or about February 3, 2015, and continuing until on or about October 6, 2015, CARLOS LOPEZ and CLEMENTE LOPEZ, not being federal licensed firearms dealers, did willfully engage in the business of dealing in firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A) and 2.


FURTHER AFFIANT SAYETH NOT.

JOSEPH DYNES
Special Agent, Bureau of Alcohol, Tobacco,
Firearms & Explosives


SUBSCRIBED AND SWORN to before me on February 23, 2016.

JEFFREY T. GILBERT
United States Magistrate Judge